## Rosalie G. Amos, et al., v. American Trust & Savings Bank, Conservator.

### Gen. No. 12,084.

1. FINDINGS OF CHANCELLOR—*when not disturbed.* The findings of the chancellor upon questions of fact will not be disturbed on appeal unless clearly and manifestly against the weight of the evidence.

2. AGENT—*insane person without power to appoint.* An insane person has no power to appoint an agent whose acts are binding upon him.

Bill to cancel promissory note and trust deed. Appeal from the Circuit Court of Cook County; the Hon. EDWARD F. DUNNE, Judge, presiding. Heard in this court at the October term, 1904. Affirmed. Opinion filed October 16, 1905.

HELMER, MOULTON & WHITMAN and GEORGE FRANTZEN, for appellants.

JOHN J. KNICKERBOCKER, for appellee; JOHN W. SMITH, of counsel.

MR. PRESIDING JUSTICE ADAMS delivered the opinion of the court.

The appellee, as conservator of the estate of Joseph J. Miller, an insane person, filed a bill against Rosalie G. Amos, John E. Amos, Jr., her husband, and Henry W. Price, successor in trust of John E. Amos, Jr., praying for the delivery and cancellation of a certain promissory note and trust deed of certain premises to secure the same, on the ground that the note and trust deed were executed by Joseph J. Miller when he was insane. The cause was heard by the court on the pleadings and evidence produced in open court, and the court, in its decree, found that April 28, 1903, Joseph J. Miller was, on the verdict of a jury, adjudged to be insane by the County Court of Cook county, and that court thereupon appointed appellee the conservator of said Miller's estate, and that appellee accepted said appointment, etc.; that for many years prior to April 28, 1903, said Miller was the owner of certain real property described in the decree, situated in Cook county, Illinois; that April 22, 1903, there was placed on record a trust deed of date April 8, 1903, purporting to have been executed and acknowledged by said Miller, and to convey the said described real estate, in trust, to secure the payment of a promissory note of date April 8, 1903, payable to the order of Rosalie G. Amos, for the sum of $4,000, with interest at the rate of 6 per cent. per annum, and that said trust deed was filed for record April 22, 1903, at three o'clock p. m.; that, at the time of the execution and delivery of said promissory note and trust deed, said Joseph J. Miller was insane and unable, for want of mental capacity, to execute the same, and had been, for several years prior to the execution of said note and trust deed, mentally incapable of contracting; that the defendants, John E. Amos, Jr., and Rosalie G. Amos, had notice and knowledge of the insanity of said Miller, at the time of the execution and delivery of said note and trust deed, and that the procuring the execution and delivery of said note and trust deed was fraudulent. Following these findings the court adjudges and decrees the cancellation of the note and trust deed, and confirms the title of Miller to the premises described in the trust deed.

The main contention of counsel for the appellants is, that the decree, in finding that Joseph J. Miller was insane and mentally incapable of contracting at the time of executing the note and trust deed, is contrary to the weight of the evidence.

The evidence as to the mental condition of Joseph J. Miller was conflicting, as it usually is in cases of this class, and it was the province of the chancellor, in this conflict of the evidence, to determine the truth of the matter. The rule, when a cause is heard as this was, and the findings of fact by the chancellor are questioned, and the reasons for the rule are thus stated in Van der Aa v. Van Drunen, 208 Ill., 115: "On the whole record we do not see how the chancellor could have found otherwise than he did; but even if we were in doubt as to the correctness of the conclusions reached by the trial court as to the facts established by the evidence, according to the well established rule of this court we would not be justified in setting aside the decree unless, from a review of the record, we were able to say that the decree of the chancellor was clearly and palpably erroneous. This case was tried before the chancellor, and as we have so often said and as is patent to everyone, the trial judge, in cases of this kind, has opportunities for correctly weighing the evidence and arriving at the truth far superior to our own, which fact this court is bound to take into consideration and give due weight thereto when called upon to review a decree." Citing numerous cases.

We have carefully read all the evidence, and think it cannot reasonably be held that the finding of the court that Joseph J. Miller was mentally incapable of contracting, at the time of the execution of the promissory note and trust deed in question, and for several years before that time, is clearly and palpably erroneous. Our conclusion from the evidence is, that said finding is well supported by the testimony of appellee's witnesses, several of whom had known him longer and more intimately, and had much better opportunity for observing him than any of the witnesses for appellants. It appears from the evidence, and

is not controverted, that for about thirty years prior to the time of the execution of the note and trust deed, Miller had been afflicted with epilepsy, and that he frequently fell down and became rigid and unconscious, and that, on recovering from such fit or spasm he would not be conscious of its having occurred, and the testimony of those nearest him, and best acquainted with him, and who, therefore, were best qualified to testify intelligently to the apparent effect of the disease on him is, that for years prior to his having been adjudicated insane his physical and mental condition was continuously growing worse, until finally he became a physical and mental wreck, incapable of taking care of himself or his property, or disposing of the latter. Mr. Edwin A. Potter, president of the American Trust & Savings Bank, and who was formerly a member of a firm engaged in commercial business, testified, in substance, that he had known Joseph J. Miller from June, 1872; that he was in the employ of witness' firm in 1872, and continued in its employ and in that of its succeeding firm until 1889, in which latter year witness quit the firm; that between 1872 and 1889 he saw Miller very frequently and also saw him after 1889, sometimes once a week, sometimes every two or three days; that from his earliest recollection of him he was subject to epileptic fits, falling on the street or floor unconscious; that he saw him have such fits very many times; that the attacks grew worse as he grew older, and destroyed his capacity for business, and that witness could observe the waning of his memory and intellect; that in 1886 the firm, on account of his mental condition, discharged him, but in 1888, he being better, they took him back again, when he traveled one year for the firm, but the firm finding that he was not competent to do the business, again discharged him. This witness further testified: "I took up consideration of his condition ten or twelve years ago with his kinspeople, his brother, Charles S. Miller, and his brother, James H. Miller. I expressed the opinion that those who are most interested in him, his brothers and sisters, should take some steps to preserve his business and

take care of it. Some foolish investments he was making led to absolute loss, and he was getting into quarrels wherever he would go, on a street car or train." In answer to a question the witness said: "Do not think he was ever competent, at any time during the last ten years, to transact business successfully or intelligently."

Other witnesses for appellee corroborated Mr. Potter's evidence as to the gradual impairment of Miller's intellect, by reason of his disease, among whom were his brother, Charles S. Miller, two sisters who lived in the same house with him for years next prior to the latter part of November, 1902, and Silas S. Willard, who was Joseph J. Miller's attorney for twenty-five years.

The evidence also shows that, by reason of his disease, his disposition completely changed, so that in his latter years he would do and say things which in his normal condition, before the disease had seriously affected him, he would not do or say.

Mr. Willard's evidence, which is corroborated by that of Miller's sisters and is not controverted, is: "He was of a very litigious nature, lately more than when I first knew him. He changed in his language and apparent disposition in later years. When I first knew him he was mild, pleasant, amiable, gentlemanly, very companionable; but in later years he was in trouble all the while with somebody, and always going to sue somebody for enormous damages."

Charles S. Miller, brother of Joseph J., after testifying that he had believed, for the last fifteen years of his life that Joseph was incapable of transacting any business, testified as follows: "It was this way: his terrible disease that had afflicted him so many years, had been gradually wearing his mentality and his body away, by degrees, so that it became simply an instance of a man without brains or judgment to guide his motives. He had many, many vagaries all the time, all the time. Before Judge Carter, on his trial, he asserted that he did not part with any of this Greenwood Avenue or Humboldt Park property. We had certified copies of the conveyances, showed them to my

brother on the trial, asked if he had ever made those con-
·veyances, each one of them.  He said no.  Showed him
·some original deeds; he recognized his signature, but said
he did not do it."   That the conveyances mentioned were
actually made by Joseph J. Miller is not questioned.   The
·evidence shows that between January 14 and April 1,
1903, Joseph J. Miller sold and conveyed to different per-
sons about fourteen lots situated in the city of Chicago, and
the evidence tends to prove that these lots were hurriedly
placed on the market and were sold for very much less than
their market value.   The court was warranted by the evi-
·dence in believing that there was a very considerable pe-
·cuniary sacrifice in the sales of the lots, although there is
a conflict in the evidence as to their market value.   The
evidence also tends to prove that he received quite a large
sum from the sale of these lots, that he owed little or noth-
ing, and that he did not need to borrow any money; also
that after he was adjudged insane no money or personal as-
sets belonging to him could be found, although search and
inquiry were made at such places as the same would be
likely to be, if in his possession, or deposited by him.

Counsel for appellants further contend that the court
erred in finding that the appellants had knowledge of the
mental incapacity of Joseph J. Miller, at the time of the
execution of the promissory note and trust deed.   It is ap-
parent from the evidence that the trust deed, although dated·
.April 8, 1903, was not executed or acknowledged until
April 22, 1903.   Neither the note nor the trust deed is
abstracted, but referring to the record we find that the trust
deed is certified by "Robert H. Mueller, Notary Public,"
to have been acknowledged before him April 22, 1903.
Robert H. Mueller, called as witness, testified that April
22, 1903, Mr. Amos called at the office of the Chicago Title
and Trust Company, where witness was employed, and
introduced to him Joseph J. Miller, whom he says he had
never before seen, and asked witness to write in the
trust deed the description of the premises intended to be
conveyed, namely, lot 1, block 41, in Hyde Park Subdivi-

sion, in sections 11, 12 and 14 in township 48 north, range 111 east of the 3rd principal meridian, which he did; that the deed, with the exception of the description, had been theretofore prepared, and that Amos asked him to take the acknowledgment of the deed, which he did. On cross-examination the witness said that Miller signed the trust deed in his presence, and that Amos took it away with him. This evidence is uncontradicted and is conclusive that the trust deed was executed and acknowledged April 22, 1903. It was filed for record the same day. April 22, 1903, was the day on which the petition was filed in the County Court, alleging the insanity of Joseph J. Miller, and praying an inquisition and the appointment of a conservator of his estate. It appears from the evidence that John E. Amos, Jr., is a practicing attorney. He became acquainted with Joeseph J. Miller under rather peculiar circumstances. He was the attorney for a Mrs. Green in a suit by her against Joseph J. Miller, in the Circuit Court of Cook county, for trespass, in which the damages were laid at $20,000. In June, 1902, he appeared at the office of Charles S. Miller, Joseph J. Miller's brother and attorney in the suit, with notice to have the case placed on the short cause calendar. Charles S. Miller testified that he told him of his brother's physical and mental condition, and the number of years of his infirmity, and said to him: "If you insist upon serving this notice upon me, I will make an affidavit of it, and go before court, at the time that you seek to have this placed upon the short cause calendar, and see if I cannot keep it off." Amos then withdrew the notice. Subsequently, about October 27, 1902, he served notice on Charles S. Miller, that on October 28, 1902, he would move the court for leave to withdraw his appearance as attorney in the Green suit. Charles S. Miller testified as follows, as to what occurred when the last notice was served on him: "I again went over with him my brother's mental condition; talked, probably, half an hour; detailed his condition, to the best of my ability, for fifteen or twenty years up to that moment; told him that my brother had no judgment,

no reason; that he had lost his mind." The witness, Miller, further testified that Amos, pursuant to the notice, withdrew his appearance in the Green suit, and shortly thereafter came to his, Miller's office, with a request from witness' brother to deliver to Amos any abstracts or papers of his brother which he might have, when he told Amos that he had none, and again went over with him the matter of his brother's mental condition, when Amos said that he had become Joseph's attorney and intended to take care of his business; that he wanted Mr. Miller as a client.

John E. Amos, Jr., testified that Charles S. Miller did not, at any of the conversations between them, intimate, in any way, that his brother was insane or unable to transact business. In this conflict, it was the province of the court to decide which spoke the truth, Amos or Charles S. Miller. The latter further testified, that, when he found that his brother was rapidly disposing of his property, he prepared and placed on record, two days before the filing of the trust deed for record, an affidavit of his brother's mental condition. If the physical and mental condition of Joseph J. Miller was as described by appellee's witnesses, and if, as the court found, properly as we think, "that he had been mentally incapable of contracting for several years prior to the execution of the said trust deed and promissory note," it is hardly within the range of possibility that John E. Amos, Jr., who was intimate with him, as his attorney, and with his property and affairs, since the latter part of October, 1902, did not know of his mental incapacity, and if Charles S. Miller informed him of his mental condition, which we think the court was warranted in believing, there can be no doubt of his knowledge that Joseph J. Miller was mentally incapable of transacting business when he signed and acknowledged the trust deed.

It appears from the evidence that Mrs. Amos had no direct personal communication with Joseph J. Miller in respect to the loan evidenced by the promissory note; that only Mr. Amos and Joseph J. Miller acted personally in the transac-

tion; and it is contended by counsel for appellants that Mr. Amos acted solely as the agent of Joseph J. Miller, and that, as Mrs. Amos had no actual knowledge or notice of the mental incapacity of Joseph J. Miller, the appellee is not entitled to relief, without returning the money loaned. The proposition that Mr. Amos was the agent of Joseph J. Miller necessarily assumes as a premise that Joseph J. Miller was mentally capable of contracting. But the finding of the court, which we approve, is that he was not. An insane person, or one mentally incapable of contracting, is also incapable of appointing an agent to contract for him. To hold otherwise would be to hold that an agent, acting for and in the name of an insane or mentally incapable person, could bind such person when he could not bind himself; that one may delegate to another, power which he, himself, has not. Such is not the law. Story on Agency, 9th ed., Sec. 6; Dexter v. Hall, 15 Wall., (U. S.) 9. John E. Amos, Jr., therefore, cannot be regarded as the agent of Joseph J. Miller in the transaction in question. Mrs. Amos knew nothing of the value of the premises described in the trust deed. Her own testimony is, in substance, that she could not say she had much knowledge of the property, except what she learned from her husband.

Mr. Amos took the trust deed, after it was executed and acknowledged, April 22, 1903, in the office of the Title & Trust Co., and it was filed for record in the recorder's office the same day, evidently by him. He filled up the check which Mrs. Amos signed for $4,000, the money loaned. He drafted the trust deed, all except the description of the premises, which he procured to be filled in by Robert H. Mueller, the notary, and he only, so far as appears from the evidence, passed on the sufficiency of the security. We think it a fair inference from the evidence that he acted as his wife's agent in making the loan, and, if so, his knowledge of the mental incapacity of Miller to contract is, in law, her knowledge. Nash v. Classen, 163 Ill., 409, 414. Appellants having had knowledge of the mental incapacity of Joseph J. Miller before and at the time of the execution of

the promissory note and trust deed, cannot invoke the aid of a court of equity to compel the return of the money alleged to have been loaned. Ronan v. Bluhm, 173 Ill., 277, 287–8. When we consider the amount of money which the evidence shows that Joseph J. Miller received on the sales of lots between January 14 and April 1, 1903, and the loan of $4,000 which it is claimed he received on the check of Mrs. Amos, and the fact that after April 28, 1903, when appellee was appointed conservator, no money or personal property belonging to his estate could be found, the conclusion that he either lost or wasted his money, by reason of mental incapacity, or fell among thieves, is inevitable. The evidence tends to show that the amount which was paid in cash on the sale of Joseph J. Miller's lots, plus $4,000, the amount of the loan, was at least $8,300.

But it is claimed that from the $4,000 loaned, Mr. Amos expended about $500 for taxes on Miller's property and for insurance. Appellants put in evidence five tax receipts, each of date April 24, 1902, and running to Joseph J. Miller, the amounts of which aggregate $449.44; also two receipts for insurance, each dated April 11, 1903, one for $30 on houses 5427 and 5429 Washington avenue, and one for $56 on house No. 3011 Cottage Grove avenue, both running to "Mr. Amos." John H. Haskell, called by appellants, testified that April 8, 1903, he was at the State Bank in Chicago, with Amos and Joseph J. Miller; that the latter put a check in and drew considerable money, and he saw him give Amos a $500 bill and a $50 bill, and heard him say to Amos, "You go over and take care of the taxes and I am going down to see Mr. Potter." We are not favorably impressed by the testimony of this witness. This was all the evidence in support of the claim that Amos paid the taxes. The paying teller of the bank testified that the check was presented April 8, 1903; that he paid the currency on it to Miller; that Amos was with Miller, and that they went over to a counter in the bank, apparently to count the money; that he did not see who counted it, and did not know who left the bank with it. In view of the uncontra-

dicted fact that the trust deed was not executed or even filled out until April 22, 1903, it seems highly improbable that Amos, a lawyer, would have given to Miller a check for his wife's money and have permitted him to cash it April 8 and take the money away with him. If the check was in fact paid April 8, is it not probable that Amos retained the money at least until the trust deed was executed? There is no evidence that Amos actually paid the taxes. How he came to pay for insurance or who was liable to pay does not appear.

The decree will be affirmed.

*Affirmed.*